IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TARA L. MORRISON | : | CIVIL ACTION |
| *A/K/A TARA L. TIETZ, AS* | : | |
| *ADMINISTRATRIX OF THE ESTATE OF* | : | No. 13-1467 |
| *WAYNE H. TIETZ, DECEASED*, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| LINDSEY LAWN & GARDEN, INC. | : | |
| *D/B/A LINDSEY EQUIPMENT F/K/A* | : | |
| *SIEPPELLA EQUIPMENT AND/OR* | : | |
| *CHARLES H. SIEPPELLA, INC.*, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                    **March 4, 2014**

        In October 2011, Wayne Tietz, a maintenance worker/snow maker at Elk Mountain Ski
Resort in Susquehanna County, Pennsylvania, was using a John Deere 4720 Compact Utility
Tractor to inventory debris and perform maintenance on the ski resort's Tunkhannock slope
when the tractor suddenly and without warning rolled onto Tietz, causing him to sustain fatal
injuries.  Tietz's wife, Plaintiff Tara L. Morrison, individually and as administratrix of Tietz's
estate, brings this wrongful death and survival action, asserting products liability-related claims
against (1) Lindsey Lawn & Garden, Inc. d/b/a Lindsey Equipment (Lindsey), which Morrison
contends is the successor to Siepiela Equipment and/or Charles H. Siepiela, Inc. (CHS), the
company from which the ski resort purchased the tractor Tietz was using at the time of the
accident, and (2) John Deere Company a/k/a Deere & Company (Deere), the manufacturer of the
tractor.  Although Deere has answered Morrison's Amended Complaint, Lindsey has filed a
motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing Morrison has
failed to allege sufficient facts to support a plausible basis for successor liability against it.  For
the reasons set forth below, Lindsey's motion will be granted insofar as Morrison seeks to hold

Lindsey liable on the theory that it expressly or implicitly agreed to assume CHS's liabilities. Because Lindsey's motion to dismiss Morrison's remaining theory of successor liability (i.e., a de facto merger between Lindsey and CHS) requires consideration of matters outside the pleadings, the Court will deny the motion without prejudice to reassertion following a brief period of discovery on this issue.

**FACTS**[1]

At some point prior to October 24, 2007, a representative of CHS and/or Deere demonstrated the capabilities of the John Deere 4720 Compact Utility Tractor (or CUT) for representatives of Elk Mountain Ski Resort.  During the demonstration, the sales person recommended that Elk Mountain purchase a 4720 CUT, representing the tractor was suitable and safe for landscaping and reconnaissance inspections on the resort's slopes.  On October 24, 2007, Elk Mountain purchased a 4720 CUT bearing Product Identification Number LV4720H470252 (the Tractor) for use in connection with landscaping and reconnaissance inspections.

On June 25, 2008, Lindsey purchased the assets of CHS pursuant to a written purchase agreement (the Purchase Agreement) in which Lindsey allegedly agreed, expressly and implicitly, to assume CHS's unknown liabilities.  Morrison also alleges as a result of the June 25, 2008, transaction, Lindsey consolidated with CHS, merged with CHS, continued the ownership and operations of CHS from CHS's former location, and continued to employ CHS's President, Samuel Siepiela, and other CHS employees on a full-time basis.

---

[1] The following facts are drawn from the allegations of Morrison's Amended Complaint, which this Court must accept as true in evaluating the instant motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

On October 11, 2011, while Tietz was using the Tractor for its intended and foreseeable purposes on the Tunkhannock slope of the Elk Mountain Ski Resort, the tractor rolled onto him, fatally injuring him.

In February 2013, Morrison filed the original Complaint in this action in the Court of Common Pleas of Philadelphia County, asserting wrongful death and survival actions against Lindsey (as CHS's successor) and Deere based on strict liability, negligence, breach of warranty, and negligent misrepresentation.  Deere removed the case to federal court the following month on the basis of diversity jurisdiction.  After Lindsey and Deere moved to dismiss the Complaint (or certain claims asserted therein), Morrison filed an Amended Complaint.  Lindsey again has moved to dismiss the claims against it in their entirety on the basis that it cannot be held liable for tortious conduct by CHS that occurred prior to Lindsey's purchase of CHS's assets. Morrison opposes the motion.  This Court held argument on the motion on December 18, 2013.[2]

**DISCUSSION**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a Rule 12(b)(6) motion, a district court first must separate the legal and factual elements of the plaintiff's claims.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The court

---

[2] By Order of December 19, 2013, this Court denied without prejudice Deere's motion to dismiss Morrison's claims for punitive damages, in which Lindsey had joined.  Also on December 19, the Court denied Morrison's motion for leave to file a second amended complaint joining CHS as a defendant and remanding this case to state court.

"must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

Because Elk Mountain purchased the Tractor from CHS approximately eight months before Lindsey acquired CHS's assets, Morrison seeks to impose tort liability on Lindsey under various theories of successor liability.[3] The parties disagree as to which state's law governs the successor liability issue. Relying on section XV(7) of the Purchase Agreement, which provides "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York and Pennsylvania without regard to its conflict of law rules," Lindsey argues the successor liability issue is governed by New York and Pennsylvania law. Morrison disputes that New York law applies, arguing the issue is governed solely by Pennsylvania law under Pennsylvania's tort-based choice of law rules.

Both Pennsylvania and New York follow the "general rule of successor liability, recognized in all jurisdictions[,] [that] when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation." *Raytech Corp. v. White*, 54 F.3d 187, 192 n.6 (3d Cir. 1995); *see Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005); *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 (N.Y. 1983). In both jurisdictions, this general rule of non-liability can be overcome if (1) the purchaser expressly or implicitly agrees to assume liability, (2) the purchase amounts to a consolidation or merger, (3) the purchaser is a mere continuation of the seller, or

---

[3] It is not clear whether Morrison also seeks to hold Lindsey liable for its own post-sale tortious conduct. At oral argument, Morrison made reference to a post-sale duty to warn theory, but the parties have not briefed this issue.

(4) the transaction was entered into fraudulently for the purpose of escaping liability.  *Cont'l Ins. Co.*, 873 A.2d at 1291; *Schumacher*, 59 N.E.2d at 245.  Pennsylvania recognizes an additional exception, imposing successor liability (5) when "the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation."  *Cont'l Ins. Co.*, 873 A.2d at 1291.[4]

Morrison relies on the first two exceptions, arguing the Amended Complaint adequately sets forth a plausible claim that Lindsey expressly and/or implicitly agreed to assume CHS's liabilities in the Purchase Agreement and the asset sale amounted to a de facto merger.[5]  The parties have not identified any material differences between Pennsylvania and New York law with respect to the first exception, and this Court has not found any.  This Court therefore need not determine which state's law governs the issue of successor liability based on an express or implied agreement.  *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).[6]

---

[4] The Pennsylvania Superior Court has also recognized the so-called "'product-line' exception . . . , which permits successor liability to be imposed for injuries caused by defective products manufactured by a predecessor if the successor continues to manufacture the product."  *Id.* at 1291 n.8.

[5] Although in her opposition papers Morrison argued Lindsey is a mere continuation of CHS, at oral argument, she indicated she was not pursuing liability under this third exception.  Morrison concedes she currently lacks evidence to suggest Lindsey is liable under the fourth or fifth exception (i.e., that the transaction was entered into fraudulently to escape liability or lacked adequate consideration and made no provisions for CHS's creditors).  Pl.'s Opp'n to Lindsey's Mot. to Dismiss, ECF No. 17 at 31 n.9.  Morrison does not mention the "product-line" exception in either her Amended Complaint or her opposition papers.

[6] "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'"  *Id.*  Under Pennsylvania's "flexible approach," the choice of law analysis applicable to a particular issue depends on how the issue is characterized.  *Id.* at 463.  "While the basic tenet of successor liability is based in corporate law, the exceptions span a loose substantive continuum from contract to corporate to tort law."  *Id.* at 464.  As a result, the applicable choice of law analysis may vary from exception to exception.

It is not clear whether the second exception—for transactions amounting to a de facto merger—presents an actual conflict.  Under New York law, a de facto merger requires some evidence of continuity of ownership.  *See New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 203, 215 (2d Cir. 2006).  Although the Pennsylvania Supreme Court recently imposed a similar requirement, holding the de facto merger doctrine "requires 'some sort of' proof of continuity of ownership or stockholder interest," the Court limited its holding to breach of contract and express warranty cases.  *Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc.*, 42 A.3d 951, 966-69 (Pa. 2012).  The Court expressly declined to address the rule in the tort context.  *See id.*; *cf. Berg Chilling Sys.*, 435 F.3d at 469 (conducting "a full analysis [of the de facto merger factors] that emphasizes the ownership factor but does not rely on it alone," in light of the Pennsylvania state courts' "failure to specifically adopt . . . a bright-line standard").

This Court, however, need not resolve the choice of law issue with respect to the de facto merger exception at this juncture.  As Lindsey acknowledged at oral argument, its argument regarding the de facto merger exception requires consideration of matters outside the pleadings.  Under Rule 12(d), this Court has discretion to convert Lindsey's motion to dismiss to a motion for summary judgment and consider matters outside the pleadings after affording Morrison a reasonable opportunity to respond.  Given the discrete issue involved, the Court finds conversion is appropriate here, but only after permitting Morrison an opportunity to take discovery on this issue.  The Court will therefore deny Lindsey's motion to dismiss without prejudice as to the de

---

*See id.* at 463-66.  Because the exception for situations where the buyer expressly or implicitly agrees to assume the seller's liabilities "is based on interpreting the terms of the parties' agreement, it is characterized most strictly as contract law."  *Id.* at 464.  Thus, even if a choice of law analysis were required, it would be appropriate to enforce the choice of law provision in the Purchase Agreement as to this particular issue.  *See id.* at 464-65.

facto merger exception at this time, and will permit Lindsey to renew the motion under the summary judgment standard following a brief period of discovery on this issue.

As to the merits, Morrison's claim that Lindsey is liable based on an express or implicit agreement to assume CHS's liabilities relies on the terms of the Purchase Agreement. *See* Am. Compl. ¶¶ 27-28 (alleging Lindsey expressly or implicitly agreed to assume liability for CHS's unknown liabilities based on section II of the Purchase Agreement). Because the Purchase Agreement is both referenced in and attached to the Amended Complaint, the Court may properly consider the Agreement at the motion to dismiss stage. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding the materials a court may consider in deciding a motion to dismiss include the complaint, exhibits attached thereto, matters of public record, and "an undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on the document"). As the Third Circuit recently recognized, "the basic rules of [contract] interpretation[] are well established and do not differ between New York and Pennsylvania." *Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012). Under the law of both states, if the language of the agreement is clear and unambiguous, the court must "follow its plain meaning," *id.*, so as to give effect to the parties' intent "as indicated by the language used," *Slatt v. Slatt*, 477 N.E.2d 1099 (N.Y. 1985); *see also Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) ("The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties.").

In the Purchase Agreement, CHS and Siepiela agreed to "transfer, sell and convey and assign" to Lindsey CHS's assets, inventory, vehicles, equipment, and parts inventory in exchange for $108,000 in cash and a $400,000 promissory note. Purchase Agreement §§ I, V.

Section II of the Agreement, captioned "Liabilities of Seller Not Transferred,"[7] provides, in its

entirety:

> The Seller's current Leases of any shop, office or other equipment used in the
> business are listed on Schedule "F." *Purchaser does not assume and Seller does*
> *not hereby transfer any of the Lease or other debts, obligations and/or liabilities*
> *of Seller.   The Seller's current known or threatened liabilities* and Seller's
> accounts payable, including but not limited to debt, trade supplier and vendor
> payables, accrued expenses, professional services, capital items, accrued payroll
> and commissions, taxes and any other such similar items *shall remain the sole*
> *liability of the Seller except any Leases as listed on Schedule "F" as specifically*
> *being assumed by the Purchaser (which are denoted "Assumed by Purchaser")*.
> The Purchaser is not assuming any general advertising or telephone book
> advertising placed by the Seller, nor will Purchaser be responsible for any past or
> future invoices for same.   The Seller shall provide a verified list at Closing of all
> known debts and obligations in excess of $500.00 and a verified list of all trade
> supplier and vendor payables.   Unless separately agreed to in writing at the
> Closing, the Purchaser does not assume any of the Seller's debts and obligations.

*Id.* § II (emphasis added).

By specifying at the outset that "Purchaser does not assume and Seller does not hereby

transfer any . . . liabilities of Seller," this provision strongly suggests not only that Lindsey did

not agree—expressly or implicitly—to assume CHS's liabilities, but that it expressly disclaimed

any assumption of such liabilities.   Morrison glosses over this broad disclaimer and focuses

instead on the sentence immediately following, arguing that by specifying the Seller shall retain

"current *known or threatened* liabilities," the provision suggests CHS did not retain unknown

and/or future liabilities such as the tort liability at issue in this case.   Morrison maintains by

failing to include unknown and future liabilities among the liabilities retained by CHS, the

Purchase Agreement reflects Lindsey's agreement to assume such liabilities.   She also contrasts

the failure to mention unknown liabilities in section II of the Agreement with the disclaimer of

---

[7] Under the terms of the Agreement, the headings used therein "are for convenience only and
shall not in any way effect the interpretation or construction of any of the provisions hereof."   *Id.*
§ XV(10).

employment-related liabilities in section VII, which provides "[t]he Seller shall retain any and all liabilities and obligations, *known and unknown*, associated with any employees of Seller with respect to employment prior to Closing." *Id.* § VII (emphasis added).

The Court disagrees with Morrison's interpretation. The statement that CHS shall retain its "current known or threatened liabilities" follows the broadly worded statement that Lindsey does not assume and CHS does not transfer *any* leases "or other debts, obligations and/or liabilities of [CHS]." *Id.* § II. This disclaimer is broad enough to encompass all liabilities, including unknown and future liabilities. *See Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309 (3d Cir. 1985) (holding purchaser's agreement to assume "all the debts, obligations and liabilities of [seller] as of the Closing Date," subject to certain limited exceptions, did not exclude unknown or contingent liabilities); *Shorb ex rel. Shorb v. Airco, Inc.*, 644 F. Supp. 923, 925, 930 (E.D. Pa. 1986) (holding agreement to convey certain corporate assets "but in no case to include any indebtedness or other liabilities of [assignor]" provided that assignee did not assume any of assignor's liabilities, including contingent tort liabilities). The fact that the sentence immediately following focuses on a narrower set of current known or threatened liabilities, which are to remain CHS's sole liability except as specifically provided in one of the schedules appended to the Agreement, does not narrow the scope of the broad disclaimer in the preceding sentence. *See Tolo, Inc. v. Wexco, Inc.*, 993 F.2d 884 (9th Cir. 1993) (unpublished) (holding where a purchase agreement excluded all assumption of liability except as expressly stated in an exhibit to the agreement, a provision specifically excluding product liability claims arising out of occurrences *prior* to the closing date did not constitute an implicit agreement that the purchaser would be responsible for product liability claims arising *after* the closing date).

Moreover, the existence of such an agreement is undercut by the indemnification provisions of the Purchase Agreement.  In section IX of the Agreement, CHS represented and warranted that there were no known suits or claims threatened against it and that,

> [i]n the event that any claim or suit should arise subsequent to the date hereof, based upon business or services rendered or activities engaged in by Seller prior to the date hereof the Seller and individual signatories hereto shall defend such claim or suit and shall indemnify and hold Purchaser harmless therefrom in all respects.

Purchase Agreement § IX(7).  Elsewhere in the Agreement, CHS and Siepiela agreed, for a period of five years after the closing,

> [to] jointly and severally indemnify and hold Purchaser . . . harmless with respect to all liabilities, claims, losses, damages, costs or expenses including reasonable attorney's fees incurred or suffered by Purchaser, directly or indirectly, by reason of or relating from . . . the operation of Seller's business, or work performed prior to transfer of the assets hereunder.

*Id.* § XI.

Morrison argues these provisions support her interpretation of the Purchase Agreement as including an agreement by Lindsey to assume CHS's unknown and future liabilities because absent such an agreement, there would be no need for CHS to provide indemnification.  On the contrary, there are numerous reasons why a purchaser of corporate assets might seek the additional protection of an indemnification provision even if it has disavowed any assumption of the seller's liabilities.  For example, even when the parties to an asset purchase agreement have agreed the purchaser does not assume the seller's liabilities, such agreement does not ensure the purchaser will not be sued by injured third parties or held liable on an alternative theory of successor liability.  Indeed, the desirability of obtaining indemnification despite a disclaimer of liability is apparent from the parties' agreement in this case.  In section VII of the Purchase Agreement, pertaining to "Employment Matters," CHS agreed to defend and indemnify Lindsey

10

from all exposure with respect to post-closing claims concerning pre-closing employment, notwithstanding that CHS expressly retained all liabilities associated with its employees with respect to pre-closing employment.  CHS's agreement to indemnify and hold Lindsey harmless for post-closing suits and claims based on CHS's pre-closing activities is thus entirely consistent with the parties' agreement that Lindsey would *not* assume CHS's liabilities.  *See, e.g.*, *Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 194 (5th Cir. 1996) (holding indemnity clause in asset purchase agreement supported purchaser's argument that it did not agree to assume seller's liabilities); *Shane v. Hobam, Inc.*, 332 F. Supp. 526, 528 (E.D. Pa. 1971) (holding asset purchase agreement provision reflecting seller's agreement to indemnify purchaser for product liability claims prior to sale "did not indicate an intention by [purchaser] to assume responsibility for [such] claims"); *Bankers Tr. Co. v. H. Hentz & Co.*, 372 N.Y.S.2d 797, 798 (N.Y. Sup. Ct. 1975) (holding provision of asset purchase agreement in which purchaser indemnified seller for liabilities not assumed indicated purchaser had not assumed all of seller's liabilities).

Because the Purchase Agreement unambiguously does not reflect an express or implicit agreement by Lindsey to assume CHS's liabilities, Lindsey cannot be liable under the first exception to the general rule of successor non-liability.  Accordingly, Lindsey's motion to dismiss will be granted insofar as Morrison seeks to establish Lindsey's liability on this basis. Insofar as Morrison seeks to hold Lindsey liable under the de facto merger exception, the motion to dismiss will be denied without prejudice.  Morrison shall have 45 days to take discovery on the de facto merger issue, following which Lindsey may renew its motion for summary judgment on this issue.

An appropriate order follows.

BY THE COURT:


    /s/ Juan R. Sánchez     
Juan R. Sánchez, J.